IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

DALWADI HOSPITALITY DAYTON, LLC
D/B/A SUMMIT INN,
                PLAINTIFF,


V.                            CIVIL ACTION NO. _____


THE CITY OF DAYTON, TEXAS,
AND LIBERTY COUNTY, TEXAS,
                DEFENDANTS.

### PLAINTIFF, DALWADI HOSPITALITY DAYTON, LLC D/B/A SUMMIT INN'S, ORIGINAL COMPLAINT

Dalwadi Hospitality Dayton, LLC, d/b/a Summit Inn, hereinafter and sometimes referred to as Plaintiff, files this, its Original Complaint against two governmental entities, to-wit: The City of Dayton, Texas and Liberty County, Texas, hereinafter and sometimes referred to Defendant(s). Plaintiff seeks damages for the complained-of civil/constitutional wrongs by the Defendants. Plaintiff also seeks reasonable and necessary attorney's fees incurred by Plaintiff in seeking to protect and enforce its rights.

Plaintiff would show onto this Honorable Court the following:

## I.    PARTIES

1. Plaintiff Dalwadi Hospitality Dayton, LLC, d/b/a Summit Inn, is a corporate entity doing business in Liberty County, Texas and licensed to do business in the State of Texas.

2.    The City of Dayton, Texas is a municipal entity, incorporated under the laws of the State of Texas.

3.    The County of Liberty is a governmental entity (county government), established under the laws of the State of Texas.

4.    Both Defendants are located within the Eastern District of Texas.

## II.    JURISDICTION AND VENUE

5.    This court has original jurisdiction under 42 U.S.C. Section 1331, which provides "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

6.    Jurisdiction vests under 42 U.S.C. Section 1443: "original jurisdiction of any civil action authorized by law…(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, or any right privilege of immunity secure by the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States," and (4) To recover

damages or secure equitable relief or other relief under any Act of Congress providing for the protection of civil rights…"; this Court has jurisdiction of Plaintiff's state law claims, for determination of title to his property/trespass to try title, pursuant to 28 U.S.C. section 1367.

7.      Jurisdiction also vests under 42 U.S.C. section 1983.

8.      All matters attendant to and referenced in this lawsuit occurred in Liberty County, Texas.

9.      Venue is proper in this Court.

### III.    FACTUAL HISTORY

10.     Summit Inn is a commercial property providing hospitality services to the public (hotel/motel).  The property is located at 604 Highway 90 East, Dayton, Texas, and is comprised of four separate single-story buildings; the door to each individual room opens directly to the outside.

11.     Dalwadi Hospitality Dayton, LLC, d/b/a Summit Inn has owned the property since 1979.

12.     Since 1979, the property has been inspected three (3) times by the City of Dayton.

13.     On Friday, February 1, 2019, the following City and County officials arrived at Plaintiff's property to conduct an inspection.  Those who attended, and their titles, are as follows: Kimberly Judge, assistant city

manager, development services for the City of Dayton; Dayton Police Chief Robert G. Vine; Police Lt. Shane Burleigh; Liberty County Fire Marshal Bill Hergemueller; Dayton Police Officer Barry Leger; City of Dayton Building Official Cassandra Gill; City of Dayton Building Inspector Tonya Cox; and City of Dayton Code Enforcement Officer Shylah Shewmake.  The inspection was conducted from 1:30 p.m. to 4:30 p.m.

14.     These officials, designated by the City of Dayton as the "Task Force,"[1] arrived without any advance notice.

15.     The officials were able to inspect sixteen (16) out of twenty (20) guest rooms at the property; officials then informed Plaintiff's agents that the inspection had revealed code violations, all of which could be repaired without closing the business down.

16.     However, later that same day, following a meeting at the Mayor's Office, the Liberty County Fire Marshal's Office tagged the property and issued a demand that all occupants immediately vacate the premises.

17.     The allegations stated in the preceding paragraph are documented in a February 1, 2019, letter: "We plan to finish inspecting the

---

[1] See *Summit Inn in Dayton shut down due to fire and building code violations,* Bluebonnet News, February 15, 2019 (https://bluebonnetnews.com/2019/02/15/summit-inn-in-dayton-shut-down-due-to-fire-and-building-code-violations/) (last visited March 15, 2022).

building as soon as practicable.  At that time, we will give you a final list of all violations."

18.      Plaintiff's agents complied with the demand/order, informing all occupants to vacate the premises.

19.      The following Wednesday, February 6, 2019, the City Inspector, a Dayton Police Officer and two other City personnel returned to inspect the remaining rooms.  This inspection took place from 9:00 a.m. to 10:30 a.m.

20. Plaintiff received the City of Dayton's final report of all violations on Saturday, February 16, 2019.

21.      The City of Dayton's final report was dated February 12, 2019.

22.      The cover letter to the report provided in part: "The City of Dayton and the Liberty County Fire Marshal's office conducted an inspection at the above premises on Friday, February 1, 2019, and completed the inspection on Wednesday, February 6, 2019."

23.      The report falsely asserted violations related to life, health, and safety.

24.      The report asserted the violations required immediate corrective action, including:

➢ Building – fire safety and evacuation plans – International Building Code Section 1001.4.[2]

➢ Building – fire alarm, smoke detection, fire sprinkler – International Building Code Section 907.[3]

➢ Building – exterior grounds – International Property Maintenance Code Section 302.[4]

➢ Mechanical – dryer exhaust – International Mechanical Code Article 504.[5]

➢ Mechanical - - exhaust fan/ventilation – International Building Code Article 1203.[6]

---

[2] The text of International Building Code Section 1001.4:  "Fire safety and evacuation plans shall be provided for all occupancies and buildings where required by the *International Fire Code.*  Such fire safety and evacuation plans shall comply with the applicable provisions of Sections 401.2 and 404 of the *International Fire Code.*" (International Fire Code: Third Printing: October 2015).

[3] This chapter of the International Building Code (Third printing: October 2015) deals with fire alarm/warning systems.  **It does not** address fire sprinkler systems; it merely describes how fire sprinkler systems may take the place of otherwise-required equipment, such as smoke detectors.

[4] This chapter of the International Property Maintenance Code (Fifth printing: September 2013) deals with the grounds/exterior of buildings.  302.7 provides that "accessory structures" such as fences be maintained in good repair.

[5] This chapter of the International Mechanical Code (Third Printing: November 2015) addresses exhaust ventilation.

[6] Section 1203 of the International Building Code (First Printing: August 2017) provides that "Interior spaces intended for human occupancy shall be provided with active or passive space heating systems capable of maintaining an indoor temperature of not less than 68˚F (20˚C) at a point 3 feet (914 mm) above the floor on the design heating day."

➢ Electrical – GFCI outlets – National Electrical Code Article 210.8.[7]

➢ Electrical – open ground – National Electrical Code Article 250.[8]

➢ Electrical – open boxes – National Electrical Code Article 314.[9]

➢ Plumbing – water heaters – International Plumbing Code Chapter 5.[10]

➢ Plumbing – hot water – International Plumbing Code Section 607.[11]

---

[7] Article 210.8 (National Electrical Code, 2017 Edition) states that ground-fault circuit-interrupters (GFCIs) shall be used for all 125-volt, single-phase, 15- and 20-amp receptacles installed in bathrooms; garages and accessory buildings; outdoors (except certain dedicated outlets); unfinished basements; crawl spaces; kitchens; receptacles within 6 feet of laundry, utility, and wet bar sinks; receptacles within 20 feet of pools, spas, or fountains.

[8] Article 250 (National Electrical Code, 2017 Edition) is the largest article in the NEC; it covers general requirements for bonding and grounding of electrical installations.

[9] Article 314 (National Electrical Code, 2017 Edition) covers the installation and use of all boxes and conduit bodies used as outlet, device, junction, or pull boxes, depending on use.

[10] Chapter 5 of the International Plumbing Code (First Printing: August 2017) "contains regulations concerning the safety of water heating units and hot water storage tanks [… ] this chapter also covers the access requirements to water heaters and hot water storage tanks to allow for the maintenance and replacement of that equipment." [Excerpted from "User Note"].

[11] Section 607 of the International Plumbing Code (Third Printing: August 2015) regulates hot water supplies to residential and non-residential occupancies, governing temperature regulation; length of pipe from heater to fixture; pump controls; recirculation controls; thermal expansion pressure controls; fixture orientation (hot water on the left); and insulation of piping.

➢ Plumbing – missing vacuum breaker – International Plumbing Code Table 608.1.[12]

25.     The February 12, 2019, letter explained, "**No work shall commence till a building permit is obtained.**"

26.     A memo from the Liberty County Fire Marshal's Office was attached to the February 12, 2019, letter.  The memo lists several "Violations related to NFPA Life Safety Codes, Texas Health and Safety Codes, and the International Fire Code[.]"

27.     It is not clear why these violations are not listed together with the other Code sections cited in the body of the City's letter.  Notably, with respect to a fire sprinkler system, the Fire Marshal's memo states "**No postings noted of Motel not having a fire sprinkler system at the front desk – Texas Health and Safety Code.**" (Emphasis Added).

28.     Between February 16, 2019 - the date of Plaintiff's receipt of the letter from the City - February 18, 2019, Plaintiff's site manager, Harish Dalwadi, made two applications for permits at City Hall.

29.     Both of Plaintiff's site manager's applications were refused.

---

[12]International Plumbing Code (Third Printing: August 2015) Table 608.1 addresses prevention of any solids, liquids, or gases entering potable water supply flow, by a "backflow preventer application."  Table 608.1 lists various types of devices and ranks the degree of hazard associated therewith as "high," "low," or "high or low."  Vacuum breakers are listed as "high or low" hazard.

30.      On February 19, 2019, Plaintiff's agent, Jay Z. Dalwadi, traveled to City Hall with a licensed electrician, Charles Bullock, to make application for the appropriate permits.

31.      The City again refused to issue a permit; Plaintiff's agent was informed by the City Hall employee that he would have to schedule an appointment to apply for a permit.

32.      Thereafter, Plaintiff's agent, Jay Z. Dalwadi, arranged a meeting with the Fire Marshal and the City representative.

33.      During this meeting, the Fire Marshall informed Plaintiff's agent of additional requirements, to which Plaintiff's agent was informed he must agree to prior to the City's issuance of the requisite permits.

34.      These additional requirements/conditions were not contained in the list of corrections in the report dated February 12, 2019.

35.      These additional requirements/conditions were not required by law and/or by any applicable code.

36.      The Fire Marshall informed Plaintiff's agent that no permit requests would be granted unless Plaintiff agreed to install a fire sprinkler system.

37.      As noted in the Fire Marshal's own memo, attached to the City of Dayton's letter, the Texas Health and Safety Code permits a regulatory

workaround - the posting of a sign at the hotel's front desk informing the public/guests that the building does not have a fire sprinkler system.

38.    The buildings on Plaintiff's property are "Existing Building[s]."[13] Existing buildings are not required (with very few exceptions, none of which is relevant in this case) to be brought into compliance with code provisions adopted/enacted after their construction; "repair, alteration, change of occupancy, addition to and relocation of existing buildings" are all governed by the IBEC.[14]    As such, the buildings are not subject to the regulations of the International Fire Code.

39.    Even if the buildings on Plaintiff's property were not "existing buildings" and were subject to the IFC, they would not be required to have sprinkler systems installed.[15]

---

[13]  *See* Section 202 of the International Existing Building Code. The International Existing Building Code was adopted by the City of Dayton in 2015; the International Fire Code was first published in 2000, and was adopted by the City of Dayton in 2015.  City of Dayton Code of Ordinances 3-101(b).  The buildings on the subject property were all in existence at the time of, and for some years before, Plaintiff's purchase of the property in 1979.

[14] IBEC Sections 202 (definition of "existing building;" and 101.1 (scope of applicability of IBEC).

[15] The International Fire Code Requires portable fire extinguishers in R-1 occupancies. IFC Sections 310.2 (definition of R-1 occupancy); 906.1 (requirement of portable fire extinguishers). Because the building is a single-story building, in which each room contains an exit directly to the outside, it is not required to have any additional fire protection systems (*see* IFC Section 907, "Fire Alarm and Detection Systems;" *also see* IFC Section 907.2.8.1, "Exceptions").

40.    Further, this additional condition (fire sprinkler system) had not been imposed on other hotel/motel properties in the City of Dayton.  For example, neither the Sands Motel (approximately 20-year-old, 2-story property in the City of Dayton), nor the Executive Inn (5 to 10-year-old, two-story property in the City of Dayton) had fire sprinkler systems installed.

41.    The City's letter to the Sands Motel, dated February 27, 2019, contains identical language to that found in the letter to the Plaintiff.[16]

42.    At the time, the Sands Motel was cited for virtually identical code violations to those listed in the City's February 12, 2019 letter to the Plaintiff, and may have been in poorer overall condition than the Plaintiff's property.[17]

43.    The Sands Motel was never shut down due to these cited violations, but was permitted to remain open for business.

44.    Shortly after citation for "major violations to life, health, and safety," the Sands Motel was able to submit a scope of work and obtain permits to correct the deficiencies and issued a permit.

---

[16] "The City of Dayton and the Liberty County Fire Marshal's office conducted an inspection at the above premises on Friday, February 15, 2019.  During the course of the inspections major violations related to life, health, and safety were found.  The violations pose a major life safety threat and require immediate corrective action."

[17] The list of violations in Defendants' letter to the Sands Motel is identical to the list contained in the letter to the Plaintiff, with two minor exceptions - Plaintiff's citations for "mechanical - dryer exhaust" and "plumbing – missing vacuum breaker."

45.     The Sands Hotel was never instructed nor required by Defendants to undertake the extraordinary expense of installing of a sprinkler system.

46.     On March 8, 2019, the Executive Inn was also cited for violations that "pose a major life safety threat and require immediate corrective action."

47.     Most of the cited violations issued to the Executive Inn were fire hazards.

48.     The Executive Inn did not have a fire sprinkler system, but did have a sign posted near their front desk, informing guests that the building lacked a sprinkler system.

49.     Regardless, the Executive Inn was never instructed nor required by Defendants to undertake the extraordinary expense of installing of a sprinkler system.

50.     The Executive Inn was never subject to closure of its business operations by Defendants; the Executive Inn remained open and operational; and the requisite permits were issued by the City of Dayton to the Executive Inn upon application therefor.

51.     The City of Dayton's immediate closure of business operations, due to the specific kinds of violations cited, was imposed only upon the Plaintiff's hotel/motel.

52.    The City of Dayton's imposition of the requirement that a sprinkler system be installed, prior to issuance of permits or reopening of business, was directed to the Plaintiff's hotel/motel property only.

53.    Four buildings are located on the Plaintiff's property: two buildings containing hotel rooms; one building containing living quarters; and one building which is used as a restaurant.

54.    Defendants informed Plaintiff's agent that the immediate closure order applied to the restaurant building as well, even though the building occupied by the restaurant had not been inspected, and was doing business separately from the Summit Inn.

55.    Plaintiff had entered a lease agreement for the restaurant building; Defendants' actions forced termination of that lease.

56.    On February 15, 2019, Liberty County's local newspaper, the Bluebonnet News, reported that the City of Dayton had released a public statement regarding the Plaintiff's property; the statement, made by the City on February 15, 2019, included the following language:

> In an ongoing effort to ensure the highest quality of life standards for citizens and visitors alike, Dayton city officials have formed a Task Force, whose purpose is to identify and take appropriate action to address any and all significant health and safety issues within the city limits of Dayton ….
> Due to the number and severity of the fire and building code violations discovered at this location, the Liberty County Fire Marshal's Office terminated business operations on the

13

premises and required the evacuation of all individuals from the premises until corrective action [is] taken ….

The occupants were given 24 hours to vacate Summit Inn. Anyone found on the premises after 24 hours will be forcibly removed …

Before this facility can be reopened for business, it must be brought up to current fire code and all other applicable safety violations must be repaired. The business will remain closed until all violations are corrected ….

The City of Dayton places a high priority on the safety of not only our citizens, but also of those who are visitors to our city. When violations such as the ones discovered at this location are identified, we have a duty and an obligation to take appropriate and correction action to ensure people are protected from harm due to failing to comply with fire and building codes, carelessness, neglect or aging structures.[18]

57.    To the best of Plaintiff's knowledge and belief, no public statements were issued by the City regarding either of the other properties cited for the same or similar violations (Executive Inn or Sands Hotel).

58.    On May 9, 2019, counsel for Plaintiff forwarded a letter to the City of Dayton, requesting a hearing under the Texas Local Government Code § 214.001, which provides the process by which a municipality may, by ordinance, require that a building be vacated if it is "dilapidated, substandard, or unfit for human habitation and a hazard to the public, health, safety, and welfare."  Tex. Local Gov't Code §214.001(a))1).[19]

---

[18] See *Summit Inn in Dayton shut down due to fire and building code violations* (Footnote 1, *supra*).

[19] The applicable statute reads as follows:

59.     The City's counsel sent a letter in response to Plaintiff's counsel's letter, by certified mail, on or about June 10, 2019, which asserted that the International Fire Code trumps the Local Government Code, and no hearing was necessary in context of the City's actions.

60.     On July 10, 2019, Plaintiff filed a writ of certiorari, pursuant to Texas Local Government Code, section 214.0001, in the district court of Liberty County, Texas (styled *Dalwadi Hospitality Dayton, LLC. d/b/a Summit Inn v. The City of Dayton*, Texas and Liberty County, Texas, in the 253rd Judicial District Court, Liberty County, Texas; CV1914895).[20]

---

Sec. 214.001.  AUTHORITY REGARDING SUBSTANDARD BUILDING.  (a)  A municipality may, by ordinance, require the vacation, relocation of occupants, securing, repair, removal, or demolition of a building that is:
(1)  dilapidated, substandard, or unfit for human habitation and a hazard to the public health, safety, and welfare;
(2)  regardless of its structural condition, unoccupied by its owners, lessees, or other invitees and is unsecured from unauthorized entry to the extent that it could be entered or used by vagrants or other uninvited persons as a place of harborage or could be entered or used by children; or
 (3)  boarded up, fenced, or otherwise secured in any manner if:
(A)  the building constitutes a danger to the public even though secured from entry; or
(B)  the means used to secure the building are inadequate to prevent unauthorized entry or use of the building in the manner described by Subdivision (2).
        (b)  The ordinance must:
(1)  establish minimum standards for the continued use and occupancy of all buildings regardless of the date of their construction;
(2)  provide for giving proper notice, subject to Subsection (b-1), to the owner of a building; and
(3)  provide for a public hearing to determine whether a building complies with the standards set out in the ordinance.

[20] See Texas Local Government Code, section 214.0001, on the application of a writ, permits judicial review, to-wit: Sec. 214.0012.  JUDICIAL REVIEW.  (a)  Any owner, lienholder, or mortgagee of record of property jointly or severally aggrieved by an order

61.      That suit remains pending as of the date of filing the instant suit.

62.      On December 11, 2019, the parties met, with counsel; Defendants finally agreed to allow Plaintiff to apply for permits to correct the cited deficiencies.

63.      Defendants required Plaintiff to obtain a report from a structural engineer; a mold inspection report from a surveyor; a plumbing inspection report from a licensed plumber; and an electrical inspection report from a licensed electrician prior to allowing Plaintiff to apply for permits.

64.      Plaintiff had obtained a report from a licensed plumber on October 1, 2019, and submitted it to Defendant City of Dayton.

---

of a municipality issued under Section 214.001 may file in district court a verified petition setting forth that the decision is illegal, in whole or in part, and specifying the grounds of the illegality.  The petition must be filed by an owner, lienholder, or mortgagee within 30 calendar days after the respective dates a copy of the final decision of the municipality is personally delivered to them, mailed to them by first class mail with certified return receipt requested, or delivered to them by the United States Postal Service using signature confirmation service, or such decision shall become final as to each of them upon the expiration of each such 30 calendar day period."  The date of receipt of the City's counsel's letter should be deemed a final decision date.

Under subsection (b) the following additional language is found: "(b) On the filing of the petition, the court may issue a writ of certiorari directed to the municipality to review the order of the municipality and shall prescribe in the writ the time within which a return on the writ must be made, which must be longer than 10 days, and served on the relator or the relator's attorney." *See Carlson v. City of Houston*, 309 S.W.3d 579, 582; 2010 Tex. App. LEXIS 1157, *4, wherein hearing below had been denied and wherein restraining order was granted by the district court.

65.      Plaintiff obtained a report from a structural engineer on January 27, 2020, and submitted it to Defendant City of Dayton.

66.      Plaintiff obtained a report from a licensed electrician on January 28, 2020, and submitted it to Defendant City of Dayton.

67.      Plaintiff obtained a mold inspection report on February 7, 2020, and submitted it to Defendant City of Dayton.

68.      Defendant City of Dayton continued to delay allowing Plaintiff to apply for permits; only after intervention through counsel, a month after Plaintiff's completion of the final documentation (mold inspection report) did Defendant City of Dayton consider Plaintiff's application for permits.

69.      Defendant City of Dayton did not issue a permit to Plaintiff until March 16, 2020.

70.      A third-party inspection was conducted and completed over a two-day period, on May 28 and May 31, 2020.

71.      After the requisite work had been completed, Defendants did not conduct a final walk-through until late June, 2020, almost a month later.

72.      Immediately upon conducting the final walk-through, the City Inspector stated that the inspection had been passed, and sent a message to Plaintiff's agent stating "I'll issue the C of O [Certificate of Occupancy] tomorrow.  I'll let you know when it's ready."

73.       The City Inspector did not issue the Certificate of Occupancy as stated.

74.       After another month had passed, in July 2020, Plaintiff's agent sent the City Inspector a message inquiring as to status; the City Inspector responded "[p]er my boss we cannot issue a Certificate of Occupancy until we get their report back and is [*sic*] viewed by our Attorney.  We are waiting for the final report to come in from the 3rd Party Inspector, then we will forward the report/results over to our Attorney for a final review."

75.       On July 31, 2020, after intervention by Plaintiff's counsel, Defendant City of Dayton issued a Certificate of Occupancy.

76.       Plaintiff re-opened for business on August 6, 2020.

78.       Plaintiff's business remained shut down for a year and a half, beginning February 1, 2019, and ending August 6, 2020.

## IV.    VIOLATION OF PLAINTIFF'S RIGHTS

79.       <u>Procedural and Substantive Due Process Rights Violations</u>:  The violation of Plaintiff's rights is evident in the Defendants' imposition of additional conditions upon Plaintiff, when such conditions were not required by law.   Defendants held permitting hostage, preventing Plaintiff from correcting the asserted deficiencies - unless Plaintiff agreed to install a sprinkler system in the facility.  This is a condition which was not imposed by

the applicable Building Codes.  Defendants forced closure of the business, when closure was neither warranted nor necessary; Defendants forced closure of the entirety of the property (including the restaurant and living quarters), regardless of the fact that Defendants had not inspected the restaurant or living quarters.

80.    Defendants' improvident acts caused Plaintiff to incur damages, forcing the property to remain vacant, as Defendants held the building permits hostage, while issuing permits to others similarly situated.  In addition, when Plaintiff timely sought a hearing – as permitted by state law – the Defendant imposed an additional burden on Plaintiff under the law, taking the position that no hearing was permitted, contrary to legislative intent, and the plain meaning of the statute.

81.    <u>Equal Protection</u>: Other properties were issued similar letters, but were permitted to remain operational/open for business while the same deficiencies were corrected; building permits were issued to these other properties, without the immediate order of closure, and without the additional, unlawful requirement for installation of a fire sprinkler system.  Plaintiff was denied equal protection under the law.

82.    An important distinction between Plaintiff and others - Plaintiff's property lies with a prime commercial development zone, targeted by the

City; instead of dealing with Plaintiff in a businesslike and lawful manner, Defendants made a decision to deny Plaintiff the rights assured to it under state and federal law, placing Plaintiff in an untenable position.

83.    Defendant City of Dayton owns land surrounding Plaintiff's property, including land directly to the east and north, as well as a portion located to the northwest of Plaintiff's property.

84.    Along the western side of Plaintiff's property lies Lowe Street.

85.    It is Plaintiff's understanding that Lowe Street was built by the previous owner of Plaintiff's property.

86.    Lowe Street lies within the boundary lines of Plaintiff's property and within the metes and bounds description contained in the plat of Plaintiff's land.

87.    Lowe Street intersects with Cook Street to the west, and appears to dead-end to on the northwestern side of Plaintiff's property, on part of the southern boundary of property owned by the City.

88.    Visitors, guests, customers, and Plaintiff's agents have historically used the road to safely enter and exit Plaintiff's property, rather than accessing the property via the busier Highway 90.

89.    Defendant City of Dayton has placed a barricade/metal gate across part some of Plaintiff's land; the metal gate lies south of the boundary

of the City's land, and is on the northwestern portion of Plaintiff's property, north of Lowe Street.

90.    Plaintiff's on site manager, Harish Dalwadi, has requested that Defendant City of Dayton remove the barricade/metal gate from Plaintiff's property; Defendant City of Dayton has refused.

91.    Defendants requested Plaintiff's permission to run a sanitation/sewage and water line across the northern part of Plaintiff's property, and Plaintiff declined to grant permission.

92.    Defendants did install a sanitation/sewage and water line along the western side of Plaintiff's property, east of Lowe Street, despite having never requested, nor having been granted, permission by Plaintiff to do so.

93.    This sanitation/sewage and water line is not recorded or reflected anywhere in the Defendant City of Dayton's records, pursuant to a recent search conducted by a surveyor retained by Plaintiff.

94.    Plaintiff believes its property to have been targeted for taking by Defendants, because of the property's location and proximity to planned development.

95.    It is Plaintiff's belief the additional conditions and denial of the permit was designed to first shutter and then to take Plaintiff's business and property, without equal protection or due process of law.

96.    Defendants did, in fact, close Plaintiff's business and take Plaintiff's property.

97.    <u>Unlawful Taking, Property Rights and Damages</u>. Defendants' acts as herein complained-of worked to deprive Plaintiff of its property and liberty interests (deprivation of life, liberty, and property in violation of the Fifth Amendment of the United States Constitution); deprivation of these rights has caused Plaintiff to incur damages.

## V.    DAMAGES, PRAYER FOR RELIEF, AND DEMAND FOR JURY TRIAL

98.    The damages associated with the complained-of acts include the following:

a.    Economic losses from the time of the closing of the facility to-wit: $1,500,000.00.  This calculation takes into consideration past, present, and future losses in revenue: future damages will be incurred long-term, as a result of the loss of reputation and goodwill, which had been earned by the Plaintiff over the course of forty years, due to the Defendants' complained-of actions; damage to the Plaintiff exacerbated, and added to, by the long-term effect of reopening with not only the burden

created by this loss, but also of the effects of the

global economic crisis created by the pandemic, and

unavailability of assistance to which Plaintiff would

have been entitled, both during and after said crisis,

but which was lost to Plaintiff due to Defendants'

complained-of actions, in addition to the fact that

Plaintiffs re-opened in the midst of a global

economic crisis (pandemic), and that, due to the

Defendants' actions, were unable to obtain any

relief funds and assistance to which they would

have been entitled, save for the Defendants'

wrongful acts.

c.    Economic losses associated with the closures of the

tangential/associated property (restaurant):

$200,000.00 (this calculation takes into account

past (lease in effect at the time of the property's

closure), present, and future losses associated with

the Defendants' wrongful acts.

d.    Damages associated with the Defendants' trespass

and use of Plaintiff's property ($500,000.00).

e.     Cost of expert (engineering) reports required by the City prior to issuance of building permits ($10,000.00).

f.     Reasonable and necessary attorney's fees pursuant to 42 U.S.C. section 1988, incurred to date ($86,000.00), including anticipated fees up to and including the trial of this matter (estimated to be an additional $90,000.00).

g.     Reasonable costs associated with this litigation.

h.     Plaintiff prays that, after notice and appropriate discovery, Plaintiff be allowed a trial by jury.

i.     Plaintiff prays for pre-judgment and post-judgment interest, and any and all relief, under law and in equity, to which Plaintiff may be deemed entitled.

DATE: March 16, 2022.

Respectfully submitted,

/s/ Ellyn Clevenger

By:_____

Ellyn Julia Clevenger
Bar Roll Number: 24058662
1115 Moody Avenue
Galveston, Texas  77550
409.621.6440
ellynclevenger@gmail.com

A JURY TRIAL IS DEMANDED